**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **HERRING CREEK ACQUISITION COMPANY, LLC,** | **Case No. 14-15309-WCH** |
| **Debtor.** | |

**[PROPOSED]**
**FIRST AMENDED DISCLOSURE STATEMENT**
**WITH RESPECT TO PLAN OF REORGANIZATION**
**OF HERRING CREEK ACQUISITION COMPANY, LLC**

**MURPHY & KING, PC**
One Beacon Street
Boston, MA 02108
D. Ethan Jeffery, Esq.
John C. Elstad, Esq.
Tel:    (617) 423-0400
Fax:    (617) 556-8985

Dated: March 2, 2015

## I.       INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Herring Creek Acquisition Company, LLC (the "Debtor") provides this first amended disclosure statement (the "Disclosure Statement") to all of the Debtor's known creditors and parties in interest.  The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *Plan of Reorganization of Herring Creek Acquisition Company, LLC* (the "Plan") dated as of the date of this Disclosure Statement, a copy of which is attached as Exhibit A.  The Debtor  has filed the Plan simultaneously with the filing of this Disclosure Statement.  A summary of the Plan, the estimated claims against the Debtor and the estimated dividend is set forth below.

The Debtor recommends that you vote to accept the Plan.  Each creditor should, however, review the Plan and this Disclosure Statement carefully in order to determine whether or not to accept or reject the Plan based upon that creditor's independent judgment and evaluation.  The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

The information contained in this Disclosure Statement has been provided by the Debtor based upon the knowledge of its records, business and affairs.  Except as otherwise expressly indicated, such information has not been subject to audit or independent review.  Although great effort has been made to be accurate, neither the Debtor nor its respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtor, including the value of its assets or the aggregate dollar amount of claims which may be allowed, are authorized other than as set forth in this Disclosure Statement.  Any representations, warranties or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or party in interest.  Each creditor or party in interest should consult with their own legal advisors with respect to any legal principles described in this Disclosure Statement.

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement,

and no person has been authorized to utilize any information concerning the Debtor's business or assets other than the information contained in this Disclosure Statement.

The Debtor believes that the Plan provides the quickest recovery to creditors and will maximize the return to creditors on their Claims. **ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

## II.   SUMMARY OF THE PLAN

The Plan provides for the payment in full to the holders of all Allowed, non-Insider Claims from the income generated by the Debtor's operations and the sale of certain of the Debtor's assets.

A summary of the types of Claims and the recovery for each type of Claim follows.

| Type of claim | Gross Estimated Claims at Petition Date | Plan Treatment | Voting Status |
|---|---|---|---|
| Class 1 Anderson Secured Claim | $24,500,000 | Subject to Plan Support Agreement | Impaired/Entitled to vote |
| Class 2   Beckers Secured Claim | $3,000,000 | Paid up to $2,500,000 | Impaired/Entitled to vote |
| Class 3  New England Phoenix Co., Inc. Secured Claim | $2,600,000 | Paid in full | Unimpaired |
| Class 4  Owen Secured Claim | $3,600,000 | Paid in full | Unimpaired |
| Class 5 Santander Bank N.A. Secured Claim | $2,505,000 | Paid in full or reinstated | Unimpaired |
| Class 6 Herring Creek Landowners Association Claims | $59,000 | Paid in full | Unimpaired |
| Class 7 General Unsecured Claims | $53,611 | Paid in full | Impaired/Entitled to vote |
| Class 8 Equity Interests | N/A | Retain equity interests | Impaired/entitled to vote |

The description of the Claims and estimation of the recoveries set forth above does not constitute an admission that the claims are Allowed Claims.  The Plan recovery is a projection and the Debtor reserves all of its rights, claims and defenses with respect to any and all Claims.

### III.   INFORMATION ABOUT THE REORGANIZATION PROCESS

#### 3.1   Purpose Of Disclosure Statement

This Disclosure Statement includes background information about the Debtor and also identifies the classes into which creditors have been placed by the Plan.  The Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed.  In addition, this Disclosure Statement contains information concerning the prospects for creditors in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor typical of a holder of impaired claims or interests to make an informed judgment about the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

#### 3.2   Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

Ethan Jeffery
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA  02108

Ballots must be received **on or before \_\_\_\_\_P.M. (Eastern Daylight Savings Time) on _____, 2015** to be counted in the voting.  Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

The Debtor recommends a vote for "ACCEPTANCE" of the Plan.

#### 3.3   Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "Ballot").  Each party in interest entitled to vote on the Plan will receive a Ballot.  All Classes are unimpaired except for Classes 1, 2, 6, 7, and 8.  Accordingly, only 1, 2, 6, 7, and 8 may vote on the Plan.  Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan.  A party who holds claims in more than one Class should complete a Ballot for each Class with respect to the applicable portion of its claim included in each Class.

### 3.4    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on _____, 2015 at __:__ _.m.,￼ or as soon thereafter as the parties can be heard. The Confirmation Hearing will be held before the Honorable William C. Hillman, United States Bankruptcy Judge, _____, Massachusetts, 02109. At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of holders of claims and interests.  The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by the Debtor and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5    Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an impaired Class is deemed to have accepted the Plan if at least 2/3 in amount and more than 1/2 in number of the Allowed Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all members of an impaired Class, the Bankruptcy Court must also determine that Class members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6    Confirmation of The Plan Without The Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes.  This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, the claimants must either receive the full value of their claims or, if they receive less, no Class with junior liquidation priority may receive anything unless the junior class provides "new value" or other consideration to the Debtor.  For example, if the holders of Allowed Priority Tax Claims are not paid in full, the holders of General Unsecured Claims are not permitted to receive anything on account of their claims.  This is known as the "absolute priority rule."

The Debtor may, at its option, choose to rely on Section 1129(b) to seek confirmation of the Plan if it is not accepted by all impaired Classes of Creditors.

## IV.    GENERAL INFORMATION

### 4.1    The Debtor's Ownership and Management

Herring Creek Acquisition Company, LLC is a Massachusetts limited liability company. The membership interests of the Debtor are held as follows: fifty percent (50%) by The Hughes Family Realty Trust, for which Robert Hughes and Susan Hughes are trustees, and twenty-five (25%) each by Megan M. Johnson (formerly Megan M. Hughes) and Sarah H. Douglas (formerly Sarah D. Hughes), the daughters of Robert and Susan Hughes.  Robert Hughes is the sole manager of the Debtor, and will continue to be the sole manager of the Debtor after the Effective Date.  Mr. Hughes is not and will not be paid a salary to manage the Debtor.

### 4.2    The Debtor's Assets

The Debtor owns, leases, manages and/or maintains several contiguous properties on land in Edgartown, Duke's County, Massachusetts, as follows.

    i.      Sanderling, located at 31 Butler's Cove Road, is improved by a four bedroom farmhouse and is rented seasonally.  As of the Petition Date, the Debtor had entered into  leases of Sanderling for the period between June 15, 2015 and August 15, 2015.

    ii.     Cove House, located at 27 Butler's Cove Road, is improved by a five bedroom, seven bathroom house, and is rented seasonally.  As of the Petition Date, the Debtor had entered into a lease of Cove House with MCCMT, LLC ("MCCMT") for the period between November, 2014 and September 8, 2015.

    iii.    Farm, located at 17, 19 and 23 Butler's Cove Road has a four bedroom, 3 bathroom apartment, as well as a separate house called the Flagpole House.  The apartment on Farm is rented seasonally.

    iv.    The Debtor is party to a ninety-nine (99) year sub-ground lease with the F.A.R.M. Institute, Inc. for approximately 40 acres of undeveloped land that the F.A.R.M. Institute, Inc. leases from the Nature Conservancy (the "Central Field" , and together with Farm and the Central Field the "Farm Property").

    v.     The Flagpole House, located at 15 Butler's Cover Road (the "Flagpole House"), is presently rented on an ongoing basis to the brother of Robert Hughes.

    vi.    The Debtor is party to a sixty-six (66) year sub-ground lease with the Herring Creek Landowners Association for approximately three (3) acres of undeveloped land that the Herring Creek Landowners Association leases from the Nature Conservancy on which is situated a barn in which the Debtor shares a leasehold interest with another, unaffiliated Member of the Landowners Association (the "Horse Barn").

### 4.3    The Debtor's Petition Date Liabilities[1]

The Debtor has filed a motion requesting that the Court enter an order establishing a bar date for the filing of claims. As the bar date has not yet passed, the description of the Claims in this Disclosure Statement is based on the Debtor's Schedules.

### A.    Secured Claims

The following creditors assert secured claims against the Debtor. The claim amounts listed below are the gross amount of the claims, without consideration of the value of the collateral securing such claims. Porter W. Anderson, Jr. ("Anderson") has a claim against the Debtor in the amount of $24,500,000 that is secured by a third priority mortgage on Cove House. William R. Beckers, Trustee of the WR & SL Revocable Trust ("Beckers") has a claim against the Debtor in the asserted amount of $3,00,000 that is secured by a fourth priority mortgage on Cove House. New England Phoenix Company, Inc. ("NEPCO") has a claim against the Debtor in the asserted amount of $2,800,000 that is secured by a fifth priority mortgage on Cove House and by a second priority mortgage on Sanderling and a second priority mortgage on the Farm. The principal amount of the NEPCO claim is approximately $2,600,000. Walter E. Owen, as trustee of the Walter E. Owen, III 2001 Trust ("Owen") has a claim against the Debtor in the asserted amount of $3,600,000 that is secured by a second priority mortgage on Cove House. Santander Bank NA ("Santander") has the following claims against the Debtor: (i) a claim in the asserted amount of $1,480,229 that is secured by a first priority mortgage on Cove House; (ii) a claim in the asserted amount of $1,024,556 that is secured by a first priority mortgage on Farm; and, (iii) a claim in the asserted amount of $475,035 that is secured by a first priority mortgage on Sanderling. The Herring Creek Landowners' Association may have a secured claim for unpaid association dues of approximately $59,000.

### B.    Administrative and Priority Claims

The Debtor anticipates that the only administrative claims will be the fees and expenses of the Debtor's professionals, including Murphy & King, Professional Corporation as general bankruptcy counsel, Eric L. Peters, Esquire, as special real estate counsel, and Ridgeway & Warner as the Debtor's accountants. The Debtor anticipates that the administrative claims will not exceed $130,000. The Debtor did not have any priority claims as of the Petition Date.

### C.    General Unsecured Claims

As of the Petition Date, the non-Insider General Unsecured Claims against the Debtor, exclusive of any Deficiency Claims, totaled approximately $53,600. The Debtor anticipates that only Anderson and Beckers may have Deficiency Claims, and those claims will be resolved by virtue of their respective Plan Support Agreements. The Debtor owed Robert Hughes approximately $567,000 as of the Petition Date on account of loans to the Debtor to pay the costs of maintaining and operating the Debtor's real estate. Mr. Hughes, as an Insider of the Debtor,

---

[1] The Debtor's description of the claims set forth in this section of the Disclosure Statement does not constitute an admission that the claims are Allowed Claims. The Debtor reserves all of its rights, claims and defenses with respect to any and all claims.

shall not receive any distributions on account of his General Unsecured Claim until the Allowed Claims of all non-Insider creditors have been paid in full or received the agreed to treatment under the terms of the Plan.

The Debtor has filed an application to retain Tea Lane Real Estate, LLC (the "Broker") as a broker.  If the sales contemplated by the P&S closes, the Debtor is obligated to pay the Broker $270,000, representing one-half of the Brokers three percent (3%) commission.

### 4.3    Pre-Petition Background

The Debtor was formed in 1995 to acquire and enforce certain rights and interests in real estate in Edgartown, Martha's Vineyard, including litigation with respect to those rights.  In a 2001 transaction with The Nature Conservancy, the Debtor received certain land and other consideration.  The Debtor completed construction of Cove House and began leasing it in 2004.  The Debtor acquired the Farm, including its attendant leases, and the Flagpole House sublease of the Central Field in 2005.

The claims asserted by Anderson, Beckers, NEPCO and Owens arose in connection with unrelated business dealings of an affiliate of the Debtor, The Commerce & Capital Group, LLC ("CCG").  CCG is a company that provides advisory services to, and investment in, middle market service companies.  CCG is owned in part by Robert Hughes.  The Debtor pledged its assets at various times as security for money contributed to CCG.  Robert Hughes also provided personal guarantees for certain of CCG's debts that are also secured by certain of the Debtor's assets.

Prior to the Petition Date, the Debtor and CCG sought to restructure their various debts, including through the sale of certain of the Debtor's assets.  In the summer of 2013, the Debtor began discussions with an affiliate of MCCMT regarding a potential purchase of Cove House and Farm.  Cove House is presently leased to MCCMT through July 1, 2015, and MCCMT has leased Cove House for several years.  The negotiations regarding the sale, which began over a year prior to the Petition Date, were complicated by various easement and permitting issues associated with the transfer of the Farm Property.  In the summer of 2014, the two-stage sale process contemplated in the P&S, whereby Cove House would be sold first followed by the sale of the Farm Property, permitted the negotiations to move to their completion.

Several months prior to the Petition Date, the Debtor had made substantial progress in the negotiation of a restructuring arrangement with its secured creditors based on the prospective sale of Cove House and the Farm Property.  However, in September of 2014, NEPCO's predecessor in interest, James Gerblick, as trustee of The James G. Gerblick Trust ("Gerblick"), assigned his claims and liens against the Debtor to NEPCO.  NEPCO flatly refused to engage in any substantive discussions regarding a consensual restructuring of the Debtor's obligations and commenced foreclosure proceedings with respect to Sanderling.  NEPCO noticed the foreclosure sale for Sanderling for November 13, 2014.  The Debtor filed its bankruptcy petition to stop the foreclosure and preserve the value of its assets and its opportunity to restructure.

## V.    SIGNIFICANT POST PETITION EVENTS

### 5.1    General Information

On November 12, 2014, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts.  The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 5.2    Chapter 11 Activity

### A.    The Purchase and Sale Agreement

On December 11, 2014 (the "P&S Effective Date"), the Debtor executed, subject to Court approval, a purchase and sale agreement (the "P&S") with Dream Enterprises LLC (the "Buyer"), an affiliate of MCCMT, for the sale of Cove House and the Farm Property.  The P&S is attached as Exhibit B to the Plan.  Dream Enterprises and its principals are not Insiders or affiliates of the Debtor

Of the approximately $18 million purchase price, $14,450,000 is assigned as the purchase price for Cove House.  A deposit for the sale of Cove House of $722,500 has been paid to the escrow agent, McCarron, Murphy & Vukota (the "Escrow Agent").  At the closing of Cove House sale, the Buyer will pay the remainder of Cove House purchase price - $13,727,500.  The price assigned to the sale of the Farm Property is $3,500,000.  A deposit of $174,960 for the sale of the Farm Property has been paid to the Escrow Agent.  At the closing of the Farm Property transaction, the Buyer will pay the remainder of the agreed purchase price - $3,325,040.

At a sale price of $14,450,000, the closing of the Cove House sale will generate enough cash to pay the Santander Cove House Claim and the Owens Secured Claim in full, with enough cash remaining to fund the Carveout under the Anderson Support Agreement (as defined below).  The Carveout permits the payment in full of NEPCO's claims, the payment of Administrative and non-Insider General Unsecured Claims in full, and the funding of a payment on account of Beckers' claims.

Prior to accepting the Buyer's offer, the Debtor obtained an opinion of value for Cove House and the Farm Property from Conover Realty/ LandVest ("LandVest").  LandVest is one of the premier real estate brokerage firms on Martha's Vineyard.  Over the last fifteen (15) years, thirty two (32)  properties have been sold on Martha's Vineyard for purchase prices of over $10 million, of which LandVest handled twenty-five (25).  In the opinion of LandVest, the Buyer's offer met or exceeded the value of Cove House and the Farm Property.  From time to time, the Debtor  also received unsolicited expressions of interest from various parties, but none was higher than the Buyer's offer.

The P&S provides for the sale of Cove House in advance of the sale of the Farm Property.  The key conditions to the closing of Cove House sale are: (i) the Buyer obtaining final approval for the construction of a path and boat ramp connecting Cove House with the Edgartown Great Pond, a fence associated with the access path and a shed near Cove House

pool; (ii) the Debtor obtaining final approval for a subdivision or reorganization of the lots comprising the Farm Property to conform with the recorded plan related to the Farm Property or to effect the transfer of a sliver of land from Cove House lot to the Farm lot; (iii) seller's receipt of the Anderson Support Agreement (as defined below); and (iv) entry of an order of the Court, not subject to stay or appeal, authorizing the sale of Cove House to the Buyer. The Cove House closing is set to take place within 10 days after the satisfaction of its key closing conditions. The Debtor spent a substantial amount of time prior to the Petition Date resolving the non-bankruptcy Cove House closing conditions, and, subject to confirmation of the Plan, expects to be able to close the sale of Cove House upon entry of a Confirmation Order.

The key conditions to the closing of the Farm Property sale are: (i) the Buyer obtaining final approval for the plans and specifications for the renovation of the Farm; (ii) the Debtor obtaining the consent of the F.A.R.M. Institute, Inc. and The Nature Conservancy for the assignment of the Debtor's sublease of the Central Field to the Buyer; (iii) entry of an order of the Court, not subject to stay or appeal, authorizing the sale of the Farm and the assignment of the Central Field sublease to the Buyer; and (iv) the closing of Cove House sale. The Farm Property closing is set to take place within 10 days after the satisfaction of its key closing conditions.

The P&S includes a provision for the payment of a break-up fee in the event that Cove House or the Farm Property is sold to a party other than the Buyer or if the Debtor retains these properties pursuant to a plan of reorganization and subsequently sells either property within six months of the confirmation of such plan. The Debtor has filed a separate motion seeking Court approval for the break-up fee.[2] If the Debtor is not successful in obtaining Court approval for the break-up fee, the Buyer, in its discretion, may terminate the P&S.

The P&S includes a provision for the payment of broker's fees to Tea Lane Real Estate, LLC (the "Broker") equal to three percent (3%) of the purchase price in consideration of its services in facilitating the sale transactions contemplated in the P&S. Subject to confirmation of the Plan, the Debtor will pay one-half of the Brokers' fees – $218,700 at the closing of the Cove House sale and $51,300 at the closing of the Farm Property sale. The Buyer will pay the other half of the Broker's fees.

If the Cove House closing occurs prior to July 1, 2015, the Buyer is entitled to a credit against the Farm Property purchase price for a certain amount of the rent paid to the Debtor under the MCCMT lease of Cove House. If the Cove House closing occurs after July 1, 2015, MCCMT shall continue as Lessee of Cove House and, to the extent a Cove House closing occurs within its lease period the Buyer shall be entitled to a prorated credit against the Farm Property purchase price at the Farm Property closing.

---

[2]  The motion also seeks approval of two potential offsets by the Buyer: (i) an inspection offset whereby, in the event the Buyer terminates the P&S on account of the Debtor's default, the costs of any inspections of the properties incurred by the Buyer may be offset against any amounts still due and payable to the Debtor under MCCMT's present lease of Cove House; and (ii) a bankruptcy fees offset whereby any bankruptcy legal fees related to the purchase of the Farm Property incurred by the Buyer after the closing of Cove House sale may be offset against the Farm Property purchase price at the closing of the Farm Property sale.

The Buyer, in its discretion, may terminate the P&S and obtain the return of the deposits that have been paid if the Debtor is not successful in obtaining an order from the Court approving Cove House sale within 120 days of the P&S Effective Date.  If the Debtor is unable to obtain Court approval for the Farm Property sale within 120 days of the P&S Effective Date, the Buyer, in its discretion, may terminate the P&S, or just the Farm Property transaction, and obtain the return of all the deposits or just the deposit with respect to the Farm Property transaction, as applicable.

The P&S provides the Buyer with a diligence period of thirty (30) days following the P&S Effective Date for Cove House, and six (6) months following the P&S Effective Date for the Farm Property.  During these periods, the Buyer has the opportunity to conduct surveys, review title, undertake feasibility studies and perform other legal diligence, and may terminate the P&S if its findings under those studies and diligence are not acceptable to the Buyer.

The P&S does not convey Sanderling or the Flagpole House to the Buyer.  These properties will be retained by the Debtor.

The P&S contains a number of conditions to the closing of the sale of Cove House.  Most of these conditions are the usual conditions to closing a sale of real estate, such as the accuracy of representations and warranties and the absence of material defects in Cove House and its heating, plumbing and mechanical systems.  Some of the conditions require third party action and/or approvals, and as of the date of this Disclosure Statement, the Debtor has made substantial progress towards satisfying these conditions to closing the sale of Cove House.  Among the primary conditions to closing, as well as the current status of those conditions, are the following (with capitalized terms as defined in the P&S):

- Delivery of the surveys necessary for the Sanderling Easement and the Driveway Easement.  These surveys have been completed.

- Delivery of subordinations for the Sanderling Easement and the Driveway Easement by the lienholders remaining on Sanderling.  The Plan both: (a) provides for the automatic subordination by such lienholders, and (b) requires such lienholders to deliver subordinations to permit the closing to occur.  If the Plan is confirmed, this condition will be satisfied.

- The completion of a house inspection (subject to final approval from the Buyer), Title V septic inspection, environmental inspection and ALTA survey for Cove House.  Pending final approval by the Buyer and the pumping of the septic system, all of these items have been completed.

- The approval by the Edgartown Conservation Commission of the Pond Access, Fence Line and the Shed.  These items have been approved by the Edgartown Conservation Commission.

- The approval of a subdivision plan to reconfigure Cove House and the Farm Property.  The documents for this item have been or are in the process of being prepared, and will

be submitted to the Land Court engineering department for the necessary approvals as soon as practicable.  The Debtor does not anticipate any material complications with such approvals.

- The approval by the Herring Creek Farm Landowners Association (the "HCFLOA") of: (a) a new members' amendment, (b) amendments to the by-laws with respect to the membership interest for Cove House and the Farm Property, and (c) modifications to the Shed and boat landing.  The documents necessary to present to the HCFLOA have been or are in the process of being completed and will be presented to the HCFLOA as soon as practicable.  The Debtor does not anticipate any material complications with the approvals.

- The delivery of the Porter Agreement.  The Anderson Support Agreement is the "Porter Agreement" as defined in the P&S, and the Debtor has delivered a copy of the Anderson Support Agreement to the Buyer.

- The delivery of deeds, easements, subordinations and other transactional documents, and other customary items necessary to close a sale of Cove House, such as the Debtor's certificate of good standing and smoke detector certificates.  The transactional documents have been or are in the process of being drafted, and the order closing items are usually obtained within two (2) weeks of closing.

## B.      The Anderson Support Agreement

On January 8, 2015, the Debtor executed a Plan Support Agreement with Porter W. Anderson, Jr. (the "Anderson Support Agreement").  The Anderson Support Agreement is attached as Exhibit A to the Plan.

In the Anderson Support Agreement, Anderson has agreed to carve out from the proceeds of his third priority Lien against Cove House certain amounts to fund the transactions contemplated in the Plan (the "Carveout").  A carve out whereby a secured creditor agrees that the proceeds of its collateral may be used to pay lower priority creditors even before its claims have been paid in full was approved by the First Circuit Court of Appeals in *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir. 1993).  The Carveout will be equal to the amount necessary to pay in full or reserve in full pending allowance the following claims: (i) NEPCO's claims; (ii) Beckers' claims, in an amount not to exceed $2,500,000; (iii) administrative costs of the bankruptcy not to exceed $130,000; and (iv) General Unsecured Claims in an amount not to exceed $65,000.  As long as he receives the agreed upon treatment under the Plan, Anderson consents to the sale of Cove House and agrees to support and vote for the Plan.

Under the Plan and consistent with the Anderson Plan Support Agreement, Anderson will receive all of the Cove House sale proceeds after payment in full of all senior secured claims and the Carveout.  Anderson will also receive all of the proceeds of the Farm Property sale after payment in full of all senior secured claims.  The Anderson Support Agreement and the Plan provide that Anderson will receive the Anderson Note.  The Anderson Note will be a promissory note issued by the Reorganized Debtor in the amount of the Anderson claim, less the amounts received by Anderson from Cove House sale, with a term of the earlier of demand or thirty-six

(36) months from the date of confirmation of the Plan.  The Anderson Note will be secured by: (i) a second priority lien on Sanderling; (ii) a first priority lien on the Flagpole House; and (iii) until it is sold, a second priority lien on the Farm.  As additional security for the Anderson Note, Robert Hughes will arrange for Anderson to be granted a second priority lien on his California residence and Hughes will cause CCG to grant Anderson a lien on CCG's personal property. The Anderson Plan Support Agreement contains other terms, and is summarized here solely for the convenience of creditors, who are encouraged to review the Anderson Plan Support Agreement in its entirety.

### C.     The Beckers Plan Support Agreement

The Debtor has executed a plan support agreement (the "Beckers Plan Support Agreement") with William R. Beckers, Trustee of the W. R. & S. L. Beckers Revocable Trust u/d/t dated May 8, 1987 ("Beckers").  The Beckers Plan Support Agreement is attached as Exhibit C to the Plan.  Under the Beckers Plan Support Agreement, Beckers has consented to the Sale of Cove House and agrees to support and vote for the Plan in exchange for agreed to treatment under the Plan.  Under the Plan and consistent with the Beckers Plan Support Agreement, Beckers will receive up to $2,500,000 in full and final satisfaction of his Claims against the Debtor.  Upon such a payment, Beckers has agreed to release his Liens on the Hughes Residence or transfer that Lien to Anderson to secure the Anderson Note.  Beckers is not releasing any claims against non-debtor third parties, including affiliates of the Debtor.  The Beckers Plan Support Agreement contains other terms, and is summarized here solely for the convenience of creditors, who are encouraged to review the Beckers Plan Support Agreement in its entirety.

## VI.     DESCRIPTION OF THE PLAN

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement. In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence.  All creditors are urged to carefully read the Plan.

### 6.1     Unclassified Claims.

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims are instead treated separately in accordance with the terms set forth in Article II of the Plan.

### A.     Administrative Expense Claims.

(1)     General.  Except for Professional Fee Claims and except as otherwise agreed to by the Debtor and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the earlier of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms; and (ii) the Effective Date.  If the Debtor disputes any portion of an Administrative Expense Claim, the Debtor shall pay the Allowed

amount of such Administrative Expense Claim within five (5) days after the entry of a Non-Appealable Order with respect to the allowance of such disputed Administrative Expense Claim.

(2)    <u>U.S. Trustee's Fees</u>.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(3)    <u>Professional Compensation and Expense Reimbursement Claims</u>.

(i)    Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.  Any such application granted by the Bankruptcy Court shall be paid: (1) within fifteen days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained; or (2) upon such other terms as may be mutually agreed upon between the Professional and the Debtor or Reorganized Debtor.

(ii)    All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Reorganized Debtor upon receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtor may agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the Reorganized Debtor to pay the fees and expenses of Professionals for services rendered after the Effective Date.

**B.    Priority Tax Claims.**

At the sole election of the Debtor, each holder of an Allowed Priority Tax Claim, if any, shall be paid either: (a) upon such terms as may be agreed to between the Debtor and the holder of an Allowed Priority Tax Claim; (b) in full in Cash on the later of the Effective Date or the date that such Allowed Priority Tax Claim would have been due if the Bankruptcy Case had not been commenced; or (c) in installment payments of Cash commencing on the Effective Date and (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim, (ii) over a period ending not later than five (5) years from the Petition Date, and (iii) in a manner not less favorable than the most favored General Unsecured Claim under the Plan (other than the manner provided to the holders of Convenience Class Claims).

**6.2    Classification.**

The Claims against and Equity Interests in the Debtor are categorized as set forth on page 3, above, for all purposes under the Plan including voting, confirmation and distribution pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent

that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

**6.3    Class 1 – Anderson Secured Claims.**

(a)    <u>Classification</u>.  Class 1 consists of the Anderson Claim.

(b)    <u>Impairment and Voting</u>.  Class 1 is impaired under the Plan.  The holder of the Class 1 Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of the Anderson Secured Claim, the holder of the Allowed Anderson Secured Claim shall receive, until paid in full, the following treatment:

     (i)    <u>Cove House Sale Proceeds</u>.  Upon the sale of Cove House, Anderson shall receive all of the Cove House Sale Proceeds after the payment in full of: (1) all Allowed Senior Secured Claims, and (2) the Carveout.

     (ii)    <u>Farm Sale Proceeds</u>.  Upon the sale of Farm, Anderson shall receive all of the Farm Sale Proceeds after the payment in full of all Allowed Senior Secured Claims.

     (iii)    <u>Anderson Note</u>.  As soon as practicable following the Effective Date, the Reorganized Debtor shall deliver to the holder of the Allowed Anderson Secured Claim: (1) the Anderson Note, (2) a second priority mortgage on Sanderling to secure the Anderson Note, (3) a first priority lien on the Flag Pole House to secure the Anderson Note, (4) pending its sale, a second priority Lien on Farm to secure the Anderson Note, (5) a second priority mortgage on the Hughes Residence to secure the Anderson Note, and (6) a Lien on CCG's personal property to secure the Anderson Note.

(d)    <u>Liens</u>.  The Liens held by the holder of the Allowed Anderson Secured Claim shall be treated as follows:

     (i)    <u>Retention of Liens</u>.  The holder of the Allowed Anderson Secured Claim shall retain all valid and perfected Liens to secure the payment of the Allowed Anderson Secured Claim; provided that such Liens shall be subordinated to the extent provided in the P&S or as is reasonably necessary to effectuate the sale of Cove House and/or Farm.

     (ii)    <u>Discharge of Liens</u>.  Upon the sale of Cove House, all Liens on Cove House securing the Allowed Anderson Secured Claim shall be discharged.  Upon the sale of Farm, all Liens on Farm securing the Allowed Anderson Secured Claim shall be discharged.  Upon

payment in full of the Allowed Anderson Secured Claim: (1) all remaining Liens securing the Allowed Anderson Secured Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed Anderson Secured Claim shall deliver to the Reorganized Debtor, within five (5) Business Days of the payment in full of the Allowed Anderson Secured Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of such Liens.

**6.4     Class 2 – Beckers Secured Claim.**

(a)     <u>Classification</u>.  Class 2 consists of the Allowed Beckers Claim.

(b)     <u>Impairment and Voting</u>.  The Allowed Beckers Secured Claim is impaired under the Plan.  The holder of the Allowed Beckers Claim shall be entitled to vote to accept or reject the Plan.

(c)     <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of the Allowed Beckers Secured Claim, the holder of the Allowed Beckers Secured Claim shall receive, on the later to occur of the Effective Date or the date such Claim becomes Allowed and at the Debtor's discretion, either: (i) payment of the Net Proceeds of the Collateral securing the its Allowed Beckers Secured Claim after the payment in full of all Senior Secured Claims, (ii) the return of the Collateral securing its Allowed Secured Claim, or (iii) treatment as agreed between the Debtor and the holder of the Allowed Beckers Secured Claim.

(d)     <u>Liens</u>.  The Liens held by the holder of the Allowed Beckers Secured Claim shall be treated as follows:

(i)     <u>Retention of Liens</u>.  The holder of the Allowed Beckers Secured Claim shall retain all valid and perfected Liens to secure the payment of the Allowed Beckers Secured Claim; provided that such Liens shall be subordinated to the extent provided in the P&S or as is reasonably necessary to effectuate the sale of Cove House and/or Farm.

(ii)     <u>Discharge of Liens</u>.  Upon the sale of Cove House, all Liens on Cove House securing the Allowed Beckers Secured Claim shall be discharged.  Upon payment in full of the Allowed Beckers Secured Claim: (1) all remaining Liens securing the Allowed Beckers Secured Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed Beckers Secured Claim shall deliver to the Reorganized Debtor, within five (5) Business Days of the payment in full of the Allowed Beckers Secured Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of such Liens.

**6.5**    **Class 3 – NEPCO Secured Claim.**

(a)    <u>Classification</u>.  Class 3 consists of the Allowed NEPCO Secured Claim.

(b)    <u>Impairment and Voting</u>.  The Allowed NEPCO Secured Claim is unimpaired under the Plan and is conclusively presumed to have accepted the Plan.

(c)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of the Allowed NEPCO Secured Claim, upon the sale of Cove House, the holder of the Allowed NEPCO Secured Claim shall receive payment in full, in cash, of the Allowed NEPCO Secured Claim from the Carveout.

(d)    <u>Liens</u>.  The Liens held by the holder of the Allowed NEPCO Secured Claim shall be treated as follows:

     (i)    <u>Retention of Liens</u>.  The holder of the Allowed NEPCO Secured Claim shall retain all valid and perfected Liens to secure the payment of the Allowed NEPCO Secured Claim; provided that such Liens shall be subordinated to the extent provided in the P&S or as is reasonably necessary to effectuate the sale of Cove House and/or Farm.

     (ii)    <u>Discharge of Liens</u>.  Upon the sale of Cove House: (1) all Liens securing the Allowed NEPCO Secured Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed NEPCO Secured Claim shall deliver to the Reorganized Debtor all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of such Liens.

**6.6**    **Class 4 – Owen Secured Claim.**

(a)    <u>Classification</u>.  Class 4 consists of the Allowed Owen Secured Claim. Any Deficiency Claim held by Owen shall be treated as a Class 7 Claim.

(b)    <u>Impairment and Voting</u>.  The Allowed Owen Secured Claim is unimpaired under the Plan and is conclusively presumed to have accepted the Plan.

(c)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of the Allowed Owen Secured Claim, upon the sale of Cove House and after the payment in full of all Senior Secured Claims, the holder of the Allowed Owen Secured Claim shall receive all of Cove House Sale Proceeds until paid in full.

(d)    <u>Liens</u>.  The Liens held by the holder of the Allowed Owen Secured Claim shall be treated as follows:

(i)    <u>Retention of Liens</u>.  The holder of the Allowed Owen Secured Claim shall retain all valid and perfected Liens to secure the payment of the Allowed Owen Secured Claim; provided that such Liens shall be subordinated to the extent provided in the P&S or as is reasonably necessary to effectuate the sale of Cove House and/or Farm.

(ii)   <u>Discharge of Liens</u>.  Upon the sale of Cove House: (1) all Liens securing the Allowed Owen Secured Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed Owen Secured Claim shall deliver to the Reorganized Debtor all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of such Liens.

**6.7    Class 5 – Santander Secured Claims.**

(a)    <u>Classification</u>.  Class 5 consists of the Allowed Santander Secured Claims. Any Deficiency Claim held by Santander shall be treated as a Class 7 Claim.

(b)    <u>Impairment and Voting</u>.  The Allowed Santander Secured Claims are unimpaired under the Plan and are conclusively presumed to have accepted the Plan.

(c)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of the Santander Secured Claims, the holder of the Allowed Santander Secured Claims shall receive the following treatment:

(i)    <u>Santander Cove House Claim</u>.  In full and complete satisfaction, settlement, discharge and release of the Santander Cove House Claim, upon the sale of Cove House and after the payment in full of all Senior Secured Claims against Cove House, the holder of the Santander Cove House Claim shall receive all of the Cove House Sale Proceeds until the Santander Cove House Claim is paid in full.

(ii)   <u>Santander Farm Claim</u>.  In full and complete satisfaction, settlement, discharge and release of the Santander Farm Claim, upon the sale of Farm and after the payment in full of all Senior Secured Claims against Farm, the holder of the Santander Farm Claim shall receive all of the Farm Sale Proceeds until the Santander Farm Claim is paid in full.

(iii)  <u>Santander Sanderling Claim</u>.  In full and complete satisfaction, settlement, discharge and release of the Santander Sanderling Claim, as soon as practicable following the Effective Date, the holder of the Santander Sanderling Claim shall receive, at the

election of the Reorganized Debtor, one of the following: (1) Cash in the amount of the Santander Sanderling Claim; (2) the treatment specified in Section 1124(2)(A) through (E) of the Bankruptcy Code; or (3) treatment as agreed between the Debtor and the holder of the Santander Sanderling Claim.

(d)  Liens.  The Liens held by the holder of the Allowed Santander Secured Claims shall be treated as follows:

(i)  Retention of Liens.  The holder of the Allowed Santander Secured Claims shall retain all valid and perfected Liens to secure the payment of the Allowed Santander Secured Claims; provided that such Liens shall be subordinated to the extent provided in the P&S or as is reasonably necessary to effectuate the sale of Cove House and/or Farm.

(ii)  Discharge of Liens.  Upon the sale of Cove House, all Liens securing the Santander Cove House Claim shall be deemed canceled, discharged and released.  Upon the sale of Farm, all Liens securing the Santander Farm Claim shall be deemed canceled, discharged and released.  Upon the payment in full of the Santander Sanderling Claim, all Liens securing the Santander Sanderling Claim shall be deemed canceled, discharged and released.  The holder of the Allowed Santander Secured Claims shall deliver to the Reorganized Debtor all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of such Liens.

**6.8  Class 6 – Class 6 – Herring Creek Landowners Association Claims.**

(a)  Classification.  Class 6 consists of any Allowed Secured Claim held by the Herring Creek Landowners Association.  Any Deficiency Claim held by the Herring Creek Landowners Association shall be treated as a Class 7 Claim.

(b)  Impairment and Voting.  The Allowed Herring Creek Landowners Association Secured Claim is unimpaired under the Plan and is conclusively presumed to have accepted the Plan.

(c)  Claim Treatment.  In full and complete satisfaction, settlement, discharge and release of the Allowed Herring Creek Landowners Association Secured Claim, upon the sale of Cove House and after the payment in full of all Senior Secured Claims, the holder of the Allowed Herring Creek Landowners Association Secured Claim shall receive all of the Cove House Sale Proceeds until paid in full.

(d)    <u>Liens</u>.  The Liens held by the holder of the Allowed Herring Creek Landowners Association Secured Claim shall be treated as follows:

    (i)    <u>Retention of Liens</u>.  The holder of the Allowed Herring Creek Landowners Association Secured Claim shall retain all valid and perfected Liens to secure the payment of the Allowed Herring Creek Landowners Association Secured Claim; provided that such Liens shall be subordinated to the extent provided in the P&S or as is reasonably necessary to effectuate the sale of Cove House and/or Farm.

    (ii)    <u>Discharge of Liens</u>.  Upon the sale of Cove House: (1) all Liens securing the Allowed Herring Creek Landowners Association Secured Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed Herring Creek Landowners Association Secured Claim shall deliver to the Reorganized Debtor all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of such Liens.

**6.9    Class 7 – General Unsecured Claims.**

(a)    <u>Classification</u>.  Class 7 consists of the Allowed General Unsecured Claims.

(b)    <u>Impairment and Voting</u>.  Class 7 is impaired under the Plan.  Each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Claim Treatment</u>.  Except as provided in Section 4.7(d) of the Plan and in full and complete satisfaction, settlement, release and discharge, each holder of an Allowed General Unsecured Claim shall receive, at the election of the Reorganized Debtor, one of the following: (1) payment in full from the Carveout, in Cash on the Effective Date, of the holder's Allowed General Unsecured Claim; (2) a Pro Rata share of bi-annual payments from the Plan Fund until paid in full; or (3) treatment as agreed between the Debtor and the holder of the Allowed General Unsecured Claim.

(d)    <u>Insider Claims</u>.  No Insiders of the Debtor shall receive any distributions on account of their Allowed Claims until the Allowed Claims of all non-Insider creditors have been paid in full or received the agreed to treatment under the terms of the Plan.

**6.10   Class 8 – Equity Interests.**

    (a)    <u>Classification</u>.  Class 8 consists of the Allowed Equity Interests in the Debtor.

    (b)    <u>Impairment and Voting</u>.  Class 8 is unimpaired under the Plan and is conclusively presumed to have accepted the Plan.

    (c)    <u>Treatment</u>.  In exchange for the Plan Contribution, the holders of the Equity Interests shall retain their respective Equity Interests.

**6.11   Reservation of Rights With Respect to Claims.**

The Debtor reserves the right to, among other things, (a) contest the right of the holder of any Claim to vote on the Plan, or designate the vote of the holder of any Claim (b) contest the right of the holder of any Claim to receive distributions under the Plan, and (c) seek to subordinate any Claim for inequitable conduct or otherwise.

**6.12   Plan Implementation.**

The Plan will be funded from the Debtor's Property, any income derived from the Property, and the sale of the Property.  Confirmation of the Plan shall constitute authorization for the Debtor or the Reorganized Debtor to use all of its Property for all purposes provided for in the Plan including, but not limited to the payment of all Allowed Claims.

**6.13   Sale of Cove House and Farm Pursuant to P&S.**

A.    Confirmation of the Plan shall constitute authorization for the Debtor or the Reorganized Debtor to sell Cove House and Farm pursuant to the P&S and to effectuate all of the terms of the P&S.  The sale of Cove House and Farm shall be free and clear of all Liens, Claims and interests pursuant to Section 363(f) of the Bankruptcy Code, including without limitation all Claims held by Anderson, Beckers, NEPCO, Owen and Santander.  The sale of Cove House and Farm pursuant to the P&S shall be entitled to the protection of Section 12.2 of the Plan.  The Debtor or the Reorganized Debtor shall distribute the proceeds of the sale of Cove House and Farm in accordance with the Plan.

B.    Within five (5) Business Days of the Effective Date, any creditor holding a Secured Claim is directed to execute and deliver to the closing attorney for the Cove House sale, such documents as are reasonably necessary to effectuate the sale of Cove House and Farm pursuant to the P&S including, without limitation, discharges of any mortgages or other Liens securing such Claim, and the following documents (each as defined in the P&S): (i) the Sanderling Easement Subordination, (ii) the Driveway Easement Subordination, (iii) the Farming and Grazing Easement Subordination, and (iv) a subordination with respect to the Blue Heron Easement.

**6.14    Other Sales of Property.**

Confirmation of the Plan shall constitute authorization for the Debtor or the Reorganized Debtor, in each's sole discretion, to sell all or any portion of its Property to fund the Plan including, without limitation, Cove House and Farm in the event that the sale pursuant to the P&S does not close; provided that the Debtor shall obtain Bankruptcy Court approval of: (a) any sale of Cove House and/or Farm other than pursuant to the P&S; and (b) any pre-Effective Date sale of Sanderling and/or the Flag Pole House. All sales, transfers or other dispositions of Property under or in conjunction with the Plan shall be free and clear of all Liens, Claims and interests pursuant to Section 363(f) of the Bankruptcy Code and shall be entitled to the protection of Section 12.2 of the Plan. The Reorganized Debtor need not obtain Bankruptcy Court approval of any post-Effective Date sale, transfer or other disposition of Property. The Debtor or the Reorganized Debtor is authorized to retain such professionals, including without limitation real estate brokers, as is necessary to sell all or any portion of its Property.

**6.15    Execution of Necessary Documents.**

A.    Confirmation of the Plan shall constitute authorization for the Debtor or the Reorganized Debtor to enter into all documents, instruments and agreements necessary to effectuate the terms of the Plan including, without limitation, the documents, instruments and agreements necessary to effectuate the P&S. The form and/or content of the documents, instruments and agreements necessary to effectuate the terms of the Plan shall be subject to the approval of the Debtor or the Reorganized Debtor, in each's sole discretion.

B.    All matters provided for in the Plan involving any corporate action required by the Debtor or the Reorganized Debtor shall be deemed to have occurred, and shall be in effect, without any requirement of further action by the Debtor, the Reorganized Debtor, their agents, representatives, members, managers, officers, directors or Affiliates.

**6.16    Organization Documents and Good Standing.**

As of the Effective Date, the Debtor's Organization Documents shall be amended as necessary to effectuate the terms of the Plan and shall become the Organization Documents of the Reorganized Debtor. To the extent that there is any inconsistency between the Plan and any of the Organization Documents, the terms of the Plan shall control. To the extent any of the Debtor is not in compliance as of the Effective Date with any state or local law requirements necessary to remain as an organized legal entity in good standing and/or remain authorized as an organized legal entity to conduct business in any jurisdiction, the Debtor or the Reorganized Debtor, as the case may be, shall be deemed to be in compliance with any such laws if they comply with such laws within six months after the Effective Date. Robert Hughes will continue to act as the manager of the Debtor after the Effective Date at his pre-petition salary.

**6.17    Revesting of Property.**

Except as otherwise provided in the Plan, the Reorganized Debtor shall be vested with all of the Debtor's Assets as of the Effective Date.

### 6.18    Preservation of Causes of Action.

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Non-Appealable Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtor shall exclusively retain and may enforce, and the Debtor expressly reserves and preserves for these purposes in accordance with sections 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtor or its Estate may hold against any person or entity.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan.

Inasmuch as NEPCO's mortgages and/or attachments were recorded within four (4) years of the Petition Date and it is unclear what consideration, if any, the Debtor received in exchange for granting NEPCO's mortgages and/or attachments, the Debtor has a cause of action to avoid NEPCO's mortgages, including pursuant Section 544 of the Bankruptcy Code and M.G.L. c. 109.  Prior to Gerblick assigning its claims and liens against the Debtor to NEPCO, payments were made to Gerblick that were not applied to the amounts allegedly owed by the Debtor. Accordingly, the Debtor may have causes of action against NEPCO arising from its failure to reflect the reduction in its debt.  The claim asserted by Beckers may include certain charges with respect to which the Debtor may have causes of action.  The Debtor has discussed those causes of action with Beckers.  Set forth in the Debtor's statement of financial affairs that is filed with the Bankruptcy Court is a list of payments made to creditors within the ninety (90) days prior to the Petition Date, and payments made to Insiders within the year prior to the Petition Date.  The Debtor has potential Avoidance Actions against the recipients of these payments, including Robert Hughes.

In the event the Effective Date of the Plan occurs and except for any Avoidance Actions against NEPCO, the Debtor does not intend to pursue any Avoidance Actions because creditors are being paid in full or are accepting alternate treatment.

### 6.19    Assumption of Executory Contracts and Unexpired Leases.

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (a) has not expired by its own terms on or prior to the Confirmation Date, (b) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (c) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (d) is not designated by the Debtor as being an executory contract or unexpired lease to be rejected at the time of confirmation of the Plan, shall be deemed assumed on the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**6.20    Payments Related to The Assumption of Executory Contracts And Unexpired Leases.**

A.    <u>Payment of Claims Arising From Assumed Contracts And Leases</u>.  Any Allowed Claims arising from the assumption of an executory contract or unexpired lease will receive, in full and complete satisfaction, settlement, release and discharge of such Claims, payment in the ordinary course of business as and when such Allowed Claims become due pursuant to such executory contract or unexpired lease.

B.    <u>Disputed Claims and Bar Date</u>.  If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an executory contract or unexpired lease, (ii) the ability of the Debtor or any assignee to provide "adequate assurance of further performance," within the meaning of Section 365 of the Bankruptcy Code, under a contract or lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and assignment of any contract or lease, the payment of any Claim related to the foregoing will be made following entry of a Non-Appealable Order resolving the dispute and approving the assumption.

**6.21    Rejection Damage Claims.**

If the rejection of an executory contract or unexpired lease by the Debtor results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, the Reorganized Debtor and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before thirty (30) days following the later to occur of: (a) the rejection of such executory contract or unexpired lease, and (b) the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Debtor or the Reorganized Debtor, as the case may be, shall have the right to object to any such Claim for rejection damages in accordance with the Plan.

**6.22    Discharge.**

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtor and the Reorganized Debtor of any debt or obligation of the Debtor that arose before the Effective Date, and any debt of the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtor or its Estate of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (a) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) such Claim is Allowed under Section 502 of the Bankruptcy Code, or (c) the holder of such Claim has accepted the Plan.

### 6.23    Injunction Relating to the Plan.

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, the Estate or the Reorganized Debtor, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

### 6.24    Releases.

Except as otherwise set forth in the Plan, as of the Effective Date, in consideration for, among other things, the obligations of the Debtor under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or equity holder of the Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case or the Plan that such entity has, had or may have against the Debtor, the Estate, the Estate's Assets, the Reorganized Debtor and/or the Reorganized Debtor's Assets.

### 6.25    Cancellation of Existing Indebtedness and Liens.

Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled, discharged and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtor.  To the extent deemed necessary or advisable by the Reorganized Debtor, any holder of a Claim shall promptly provide the Reorganized Debtor with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

### 6.26    Exculpation.

Except as otherwise set forth in the Plan, neither the Debtor, the Reorganized Debtor, nor any of their respective present or former members, managers, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of the Bankruptcy Case, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of Section 9.5 of the Plan shall not apply to any liability for willful misconduct or ultra vires acts.

### 6.27    Tax Consequences of the Plan.

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan.  This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States).  This summary does not discuss any aspects of state, local or foreign taxation.  The impact on foreign holders of claims and equity interests is not discussed.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.  Moreover, due to a lack of definitive judicial or administrative authority or interpretation and the complexity of the transactions contemplated in the Plan, substantial uncertainties exist with respect to various tax consequences of the Plan.  The Debtor has not requested a ruling from the Internal Revenue Service (the "IRS") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto.  There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN.  THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

A.      **Federal Income Tax Consequences to the Debtor.**

Cancellation of Indebtedness.  Generally, the Debtor will realize cancellation of debt
("COD") income to the extent, if at all, that the Debtor pays a creditor pursuant to the Plan an
amount of consideration in respect of a Claim against the Debtor that is worth less than the
amount of such Claim.  For this purpose, the amount of consideration paid to a creditor generally
will equal the amount of cash or the fair market value of property paid to such creditor.  Because
the Debtor will be in a bankruptcy case at the time the COD income is realized (if any is
realized), the Debtor will not be required to include COD income in gross income, but rather will
be required to reduce tax attributes by the amount of COD income so excluded.

B.      **Tax Consequences to Creditors.**

In General.  The federal income tax consequences of the implementation of the Plan to a
holder of a Claim will depend, among other things, on: (a) whether such Claim constitutes a debt
or a security for federal income tax purposes, (b) whether the holder of the Claim receives
consideration in more than one tax year, (c) whether the holder of the Claim is a resident of the
United States, (d) whether all the consideration received by the holder of the Claim is deemed to
be received by the holder of the  Claim as part of an integrated transaction, (e) whether the
holder of the Claim reports income using the accrual or cash method of accounting, and (f)
whether the holder has previously taken a bad debt deduction or worthless security deduction
with respect to the Claim.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain
or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property
in an amount equal to the difference between (i) the sum of the amount of any cash and the fair
market value on the date of the exchange of any other property received by the holder (other than
any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the
adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued
but unpaid interest previously included in the holder's taxable income). Any gain recognized
generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid
interest or accrued market discount, as described below) if the Claim was a capital asset in the
hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's
holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim
constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset.
For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

C.      **Information Reporting and Backup Withholding.**

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may
be subject to backup withholding at the rate of 31 percent with respect to payments made
pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt
categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer
identification number and certifies under penalties of perjury that the taxpayer identification

Case 14-15309   Doc 65   Filed 03/02/15   Entered 03/02/15 13:53:47   Desc Main
Document    Page 28 of 31

number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

## VII.   MISCELLANEOUS

**7.1   Exemption from Transfer Taxes.**

As is described above, the Plan contemplates the sale or transfer of Property, including pursuant to the P&S. Section 1146(c) of the Bankruptcy Code provides that transfers of property pursuant to a confirmed plan are not subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Sales of Property after the Confirmation Date will not, therefore, be subject to any such tax or assessment.

## VIII.   FEASIBILITY AND LIQUIDATION ANALYSES

**8.1   Feasibility of the Plan.**

The Plan provides, through the orderly sale of Cove House and the Farm Property and the operation of those assets that are retained, for the satisfaction of all Claims either by payment in full, by agreement or through treatment authorized by the Bankruptcy Code.

Under the Plan, the Debtor will sell Cove House and the Farm Property to the Buyer, free and clear of all liens, claims and interests, for approximately $18 million. The sale of Cove House will generate sufficient funds to pay the Santander Cove House Claim, the Owen Secured Claim and the Herring Creek Landowners Association Secured Claim in full, and will leave sufficient cash to fully fund the Carveout. Using the cash made available by the Carveout, the Debtor will be able to pay NEPCO's Claim in full, pay up to $2,500,000 on account of Beckers' Claim, and pay all Administrative Claims and non-Insider, non-Deficiency Claim General Unsecured Claims in full. Anderson's Deficiency Claim is resolved by the Anderson Support Agreement. Beckers' Claim is unliquidated, and in the event that Beckers' Claim exceeds $2,500,000, General Unsecured Claims will be paid in full over time from the Plan Fund. The proceeds from the Farm Property sale, approximately $3,500,000, will be sufficient to pay the Santander Farm Claim in full, with the balance of the sale proceeds being paid to Anderson to be applied to the Anderson Note.

Under the Plan, the Debtor will retain Sanderling and the Flagpole House. The Santander Sanderling Claim will be reinstated and will be paid according to its terms from the rental revenue generated by Sanderling and the Flagpole House. The Debtor estimates that it will require approximately $42,000, to be paid from the Plan Fund, to reinstate the Santander Sanderling Claim. Once the Santander Sanderling Claim is reinstated, the monthly payments on account of that claim will be approximately $4,500. Historically, Sanderling and the Flagpole House have generated approximately $95,000 in annual revenue, against annual expenses, inclusive of payments to Santander, of approximately $90,000. The rental revenue from Sanderling and the Flagpole House will therefore be sufficient to make the necessary payments on account of the Santander Sanderling Claim. Anderson will have a second Lien, after Santander, on Sanderling and the Flagpole House to secure the Anderson Note.

Based on its knowledge of the Buyer and its members and affiliates, the Debtor is confident that the Buyer has the financial capability to fulfill its obligations under the P&S. In the event that the sale contemplated under the P&S does not close, the Debtor intends to locate a new buyer for Cove House and/or the Farm Property and sell one or both properties pursuant to the Plan. The Debtor has received multiple expressions of interest in both properties, both before the Petition Date and after. Based on the foregoing, the Plan is feasible.

### 8.2    Best Interests of Creditors And Comparison With Chapter 7 Liquidation.

As a condition to confirmation of the Plan, Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each holder of a claim or an interest in an impaired Class of Claims or Equity Interests must either accept the Plan or receive or retain at least the amount or value it would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

Upon conversion to Chapter 7, the Debtor's operations would cease and a trustee would be appointed to liquidate the Debtor's Assets. The amount that would be realized from the sale of the Debtor's Assets at liquidation is generally substantially less than the non-distressed value that will be realized under the Plan from an orderly sale and operation of those Assets. The liquidation of the Debtor's assets in Chapter 7 would result in substantial additional administrative costs as the Chapter 7 trustee would need to hire professionals to analyze and liquidate the Debtor's assets. This would delay both the liquidation of the Debtor's assets and the payment of creditors.

Based on the P&S, Cove House has an orderly sale value of approximately $14,450,000. Even before any discount in this value for a liquidation sale, the proceeds of a Cove House sale would be sufficient to pay only the Santander Cove House Claim, the Owens Secured Claim and the Herring Creek Landowners' Association Secured Claims in full, as well as pay approximately $9,300,000 of Anderson's Secured Claim of approximately $24,500,000. Beckers would receive nothing from the sale of Cove House, leaving him with a Deficiency Claim of up to $3,000,000. While the liquidation sale of Sanderling and the Farm Property may generate sufficient funds to pay Santander and NEPCO, the two creditors with Liens on those properties, in full as well as generate additional cash to pay unsecured creditors, that cash would first be paid to the Chapter 7 administrative costs. Even if funds were left over to pay to General Unsecured Creditors, the Anderson and Beckers Deficiency Claims, which would total not less

than $18,200,000, would significantly dilute the dividend to the holders of General Unsecured Claims.  As a result, in a Chapter 7, the holders of General Unsecured Claims would not receive a meaningful distribution.

In contrast, the Plan provides for the payment in full of all General Unsecured Claims, as well as the payment in full of all other Claims or their treatment by agreement of the holders of those Claims.  Accordingly, confirmation of the Plan will result in a substantially more certain and greater return for most creditors than might be realized if these cases were converted to cases under Chapter 7 of the Bankruptcy Code.


HERRING CREEK ACQUISITION COMPANY, LLC,


By: _/s/ *Robert Hughes*_____
Robert Hughes, Manager

Dated: March 2, 2015



_/s/ *D. Ethan Jeffery*_____
MURPHY & KING, P.C.
One Beacon Street
Boston, MA  02108
Attn:   D. Ethan Jeffery, Esq. (BBO #631941)
        John C. Elstad, Esq. (BBO#654469)
Telephone: (617) 423-0400
Facsimile:  (617) 556-8985

684481

## **Exhibit A**

The Plan was filed and served separately.